IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LESLIE L. HERNANDEZ-DEVEREAUX,

                        Plaintiff,                                 CV-08-3007-ST

          v.                                    OPINION AND ORDERS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                          Defendant.                 

STEWART, Magistrate Judge:

## **INTRODUCTION**

Plaintiff, Leslie L. Hernandez-Devereaux, seeks judicial review of the Social Security Commissioner's final decision denying her application for Supplemental Security Income ("SSI") benefits. This court has jurisdiction over this claim under 42 USC § 404(g). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). For the reasons stated below, the Commissioner's decision is reversed, and this case is remanded for payment of benefits.

## ADMINISTRATIVE HISTORY

Plaintiff filed her application for SSI in August 2001.  Tr. 244.[1]  It was denied initially and on reconsideration.  Tr. 231-40.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  Tr. 241-42.  After holding a hearing on December 15, 2004, at which plaintiff, her daughter, and a vocational expert ("VE") testified (Tr. 661-88), ALJ Jean A. Kingrey issued an Unfavorable Decision on March 23, 2005, denying plaintiff's claim.  Tr. 81-97.  Plaintiff submitted a Request for Review of the decision (Tr. 98-100), and on March 13, 2006, the Appeals Council vacated the decision and remanded the case back to the ALJ with specific findings and instructions.  Tr. 105-07.

ALJ Kingrey held another hearing on November 7, 2006, at which plaintiff testified along with a VE and medical expert.  Tr. 689-729.  The ALJ issued a second Unfavorable Decision on May 9, 2007.  Tr. 14-35.  The Appeals Council denied plaintiff's second request for review (Tr. 7-13), rendering the ALJ's May 9, 2007 decision the Commissioner's final decision. 20 CFR §§ 416.1481, 422.210; *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007).

## BACKGROUND

Born in 1966, plaintiff was 41 years old at the time of the ALJ's final decision.  She completed high school, a few terms of college, and training as a certified nursing assistant ("CNA").  Tr. 85.  She last worked as a cashier at a truck stop from October 1999 to June 2000.  Tr. 85, 694.  She also has work experience as a CNA and answering phones and babysitting for an escort service.  Tr. 85, 384, 298-99, 701.

---

[1]  "Tr." refers to the Transcript of the Administrative Record filed May 27, 2008 (docket #14).

Plaintiff alleges that she became disabled on June 30, 2001, due to a panic disorder and depression which cause her to get "too nervous at times" and renders her "unable to leave [her] house." Tr. 290. She has an extensive treatment history for a variety of psychological and physical conditions including panic disorder, anxiety attacks with agoraphobia, cyclothymic disorder, borderline personality disorder, posttraumatic stress disorder ("PTSD"), adult attention deficit disorder ("ADD"), sleep disturbances, bulimia, migraines, edema, psoriasis, and domestic abuse.

Despite receiving several years of mental health therapy and treatment and taking a variety of medications, plaintiff alleges her mental condition continues to render her totally disabled. *See* Tr. 409-42 (treatment records from Hawthorne Mental Health Clinic/Rural Clinics Mental Health ("RCMH") from August 30, 1999, to January 23, 2001); Tr. 480-523 (treatment records from Jackson County Mental Health ("JCMH") from June 14 to November 16, 2001); Tr. 154-55, 171 (recording various medications taken 2005-06). Her most significant complaint is her severe anxiety and panic attacks which cause an increased heart rate, cold, clammy hands, and nausea. Her attacks cause her to lock herself in her room, keep her from caring for herself of leaving her house, and make her prematurely leave a location, such as a store. Tr. 171, 156-57, 218, 338. When suffering one of her attacks, she sometimes feels like she is going to die and reports having gone to the emergency room on several occasions due to her fear. Tr. 338, 545, 667. She also experiences periods of manic activity and elevated mood followed by periods of severe depression. Tr. 501.

Plaintiff subsists on food stamps, child support payments, and social security benefits paid to several of her children from one of her ex-husbands who suffers from a mental disability.

Tr. 671, 695.  Her children help her with the shopping, household chores, and cooking.  Tr. 669, 695-96.  She has also received help from friends, including a friend who cared for one of her children during a particularly difficult period of depression.  Tr. 695-96.

## DISABILITY ANALYSIS

In construing an initial disability determination under Title XVI, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR § 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR §§ 416.909; 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR § 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 416.920(a)(4)(iv). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR § 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id.* If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 416.966.

## ALJ'S FINDINGS

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 30, 2001, the alleged date of onset. Tr. 20. At step two, she found that plaintiff suffers from the following severe impairments: borderline personality disorder, with histrionic, avoidant, and antisocial features; anxiety disorder with possible panic attacks; and cyclothymic disorder, rule-out bipolar disorder. *Id*. At step three, she found that plaintiff does not suffer an impairment or combination of impairments that meets or medically equals one of the listed impairments. *Id*.

The ALJ then found that plaintiff has the RFC to perform work without exertional limitations in which she does not interact with the general public; has no close interaction with co-workers; does no interstate driving; is not in a crowded work setting; and has no frequent changes in work routines or locations. *Id.* Based on this RFC and the testimony of a VE, the ALJ concluded at steps four and five that plaintiff was not able to perform her past work, but

that, considering her age, education, work experience and RFC, jobs exist in significant numbers in the national economy that she can perform.  Tr. 33-34.  Thus, the ALJ concluded that plaintiff was not disabled.  Tr. 35.

## PLAINTIFF'S CHALLENGES

Plaintiff contends that the ALJ made six errors:  (1) failing to follow the specific directions of the Appeals Council in its March 13, 2006 Remand Order; (2) rejecting the opinions and ultimate conclusions of plaintiff's examining physicians concerning the severity of her mental impairments without giving sufficient reasons; (3) substituting her own opinion for that of plaintiff's examining medical sources, making her own independent medical findings and speculative inferences from the record; (4) basing her decision simply on isolated specific items of evidence without considering the record as a whole and failing to properly evaluate the combined effect of plaintiff's impairments to determine whether they meet a listed impairment or resulted in limitations of disabling severity; (5) rejecting plaintiff's subjective symptom testimony without giving sufficient reasons; and (6) relying on the VE's opinion which was based on an incomplete and inaccurate hypothetical that did not consider all of her limitations. As a result, plaintiff seeks a reversal of the ALJ's opinion and a remand for payment of benefits.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004).  This court must weigh the evidence that supports and detracts from the ALJ's conclusion.  *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*,

157 F3d 715, 720 (9th Cir 1998).  The reviewing court may not substitute its judgment for that of

the Commissioner.  *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see*

*also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001).  Variable interpretations of the

evidence are insignificant if the Commissioner's interpretation is a rational reading.

*Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

## DISCUSSION

**I.      Motion to Expand Record**

As a preliminary matter, plaintiff moves to expand the Administrative Record to include

three exhibits (docket #16).

The motion is denied as moot as to Exhibit B which is already part of the Administrative

Record.  Tr. 41-61.

The other two exhibits not contained in the administrative record are plaintiff's letter

brief requesting review of the ALJ's May 9, 2007 decision denying her claim (Exhibit A) and

correspondence from plaintiff to the ALJ requesting that her medical expert, Dr. Rory F.

Richardson, Ph.D., be permitted to testify by telephone due to a recent back surgery that renders

him unable to appear in person (Exhibit C).  Both of these exhibits are part of the administrative

proceedings below, yet the Commissioner has offered no explanation for their absence from the

Administrative Record.   Instead, the Commissioner argues that they do not constitute new and

material evidence concerning plaintiff's claim and did not serve as the basis for the decision at

issue here.  Even if they did not serve as the basis for the ALJ's decision, they are properly part

of the record because they chronicle the underlying proceedings which occurred in this case.

Exhibit A is referred to, at least implicitly, in the Appeals Council's notice denying review of the

ALJ's second decision.  Tr. 7.  Exhibit C is relevant to establish plaintiff's attempt to present the

telephonic testimony of an expert on her behalf which was denied by the ALJ.  Tr. 693.

Although neither of these exhibits address any disputed matter, plaintiff's motion is granted as to

Exhibits A and C in order to complete the Administrative Record.

## II.    Compliance with the Remand Order

### A.    Appeals Council's Findings and Instructions

On March 13, 2006, the Appeals Council concluded that the ALJ had made several errors

in her opinion that required additional consideration.  Tr. 105-07.  First, the Appeals Council

found that the ALJ inadequately addressed the opinions of examining physician Dr. Richardson,

and reviewing physician Dr. Bill Hennings, Ph.D.  It also found the ALJ's opinion deficient

because it failed to provide an adequate rationale for the findings and conclusions concerning the

nature and severity of a claimant's mental impairments.  *See* 20 CFR § 416.920a (setting forth

severity analysis for mental impairments).

To remedy these errors, the Appeals Council instructed the ALJ to allow plaintiff to

submit updated treatment records; to obtain additional evidence concerning her mental

impairments, including a consultative mental status examination with psychological testing and

medical source statements about what she can still do despite her impairments; and to further

evaluate the treating and examining source opinions, including, "as appropriate," by requesting

additional evidence or clarification of her treating and examining physicians' opinions about

what she can still do despite her impairments.  Tr. 106.  It further instructed the ALJ to evaluate

plaintiff's mental impairments in accordance with 20 CFR 416.920a, evaluate her subjective

complaints, and give additional consideration to her maximum RFC.  *Id*.  Finally, it indicated

that, if warranted, the ALJ should expand the record and obtain supplemental evidence from a VE. *Id*.

**B.    ALJ's Alleged Failures**

Plaintiff contends that on remand the ALJ failed to comply with these instructions by: (1) refusing to receive additional testimony from Dr. Richardson by phone even though he made himself available to testify; and (2) failing to obtain additional medical evidence to adequately address the issues on remand.

**C.    Legal Standards**

It is legal error for an ALJ to disregard the Commissioner's regulations. *See Orn v. Astrue*, 495 F3d 625, 635-36 (9th Cir 2007). As set forth in 20 CFR § 416.1477, on remand the ALJ "shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order." Thus, to the extent that the ALJ here failed to properly follow the Appeals Council's instructions, she committed reversible error unless the errors were harmless, *i.e.*, they would not have affected the ALJ's ultimate conclusions. *See Batson*, 359 F3d at 1197.

///

///

**D.    Analysis**

The majority of the Appeals Council's instructions merely ordered the ALJ to comply with the Commissioner's regulations concerning analysis of mental disorders, weighing of medical testimony, assignment of disability, and others. If the ALJ failed to meet its legal obligation to follow the Commissioner's regulations for evaluating mental limitations, medical

opinions, and plaintiff's testimony, then she committed reversible error regardless of the Appeals Council's commands. These issues are addressed below and need not be evaluated independently as noncompliance with the Appeals Council's Order.

One requirement by the Appeals Council going beyond the ALJ's ordinary duty to develop the record was the directive to obtain an additional examination of plaintiff. However, the ALJ did so. *See* Tr. 170-83.

The remaining issue concerning noncompliance with the Appeals Counsel's instructions is the ALJ's refusal on remand to permit Dr. Richardson to testify telephonically at the hearing. The Appeals Council noted that while the ALJ's original opinion "mention[ed] some of Dr. Richardson['s] . . . findings . . . she [did] not adequately evaluate the opinion evidence nor [did] she cite any medical evidence or findings to explain how these opinions are inconsistent with the medical evidence" as required by 20 CFR § 416.927(d). Tr. 105. In her second opinion, the ALJ conducted a more extensive analysis of Dr. Richardson's opinion. However, plaintiff argues that by not permitting Dr. Richardson to testify by telephone, while permitting a medical expert for the agency to do so, the ALJ failed to adequately address the issues brought up by Dr. Richardson in his opinion.

Originally, plaintiff obtained the ALJ's permission to have Dr. Richardson testify at the hearing in person, but due to a surgery, he was unable to travel to the hearing. Tr. 693. Plaintiff informed the ALJ of this fact and requested that he be permitted to testify by telephone. Tr. 693; Motion to Expand the Record to Include Omitted Material, Exhibit C. The ALJ denied that request. Tr. 692-93. When plaintiff objected, the ALJ explained that it was "office policy to require witnesses to appear at the hearing . . . if they're for the claimant." Tr. 693. She

continued: "We can have ours by phone but the problem is where do you draw the line of how many witnesses get to appear by phone." *Id*. Instead, the ALJ permitted plaintiff to make an offer of proof at the close of the hearing to determine whether she needed to hold a supplemental hearing to receive Dr. Richardson's testimony. *Id*. When the plaintiff was unable to offer any substantive information about Dr. Richardson's proposed testimony, the ALJ agreed to hold the record open for 20 days to allow plaintiff to submit any additional information she could obtain from Dr. Richardson. Tr. 724. Plaintiff submitted no additional information.

In light of the procedure followed in this case, the ALJ's failure to permit Dr. Richardson to testify did not violate the Appeals Council's Remand Order. The Appeals Council did not order the ALJ to obtain additional information specifically from Dr. Richardson, but to provide further analysis of his opinion and, "[a]s appropriate" to recontact medical sources for clarification about what the plaintiff was able to do. While it does seem inherently unfair for the ALJ to permit her own medical expert to testify by telephone and yet deny the same consideration to plaintiff's medical expert, plaintiff was not prejudiced from presenting her case. Since plaintiff failed to provide any additional evidence in the 20-day time-frame given by the ALJ, this court cannot ascertain what, if anything, Dr. Richardson's telephone testimony would have added. Thus, the ALJ's decision not to permit him to testify did not violate the Appeals Council's order.

Plaintiff also asserts that the ALJ's decision violates her right to procedural due process. Intoning a constitutional doctrine does not give rise to a colorable constitutional claim. *See Klemm v. Astrue*, 543 F3d 1139, 1144 (9th Cir 2008) ("A 'mere allegation of a due process violation' is not a colorable constitutional claim."), quoting *Anderson v. Babbitt*, 230 F3d 1158,

1163 (9th Cir 2000). "Rather, the claim must be supported by 'facts sufficient to state a violation of substantive or procedural due process.'" *Id*, quoting *Anderson*, 230 F3d at 1163 (quotations omitted). Here, plaintiff has advanced no colorable basis for finding a procedural due process violation. There is no allegation that the ALJ's decision denied her the opportunity to prove her claim or that she did not understand the procedures for submitting medical evidence or that her mental impairment in some way prevented her from complying with the procedures. *See, e.g., Udd v. Massanari*, 245 F3d 1096, 1099 (9th Cir 2001) (holding the plaintiff asserted a colorable due process claim where he was not represented by counsel and alleged that he lacked the mental capacity to understand the administration's termination notice and the procedures for contesting his termination). Her complete inaction in the face of the ALJ's offer to allow her time to submit additional information defeats any contention that the process on remand from the Appeals Council created any risk of erroneous deprivation of her property interest in social security benefits. *See, cf., Disabled Rights Union v. Shalala*, 40 F3d 1018, 1022 (9th Cir), *cert denied*, 516 US 832 (1994) (setting forth standard test for procedural due process), citing *Matthews v. Eldridge*, 424 US 319, 335 (1976).

## III.    RFC

Plaintiff primarily asserts that the ALJ assigned her an RFC that does not reflect the true extent of her limitations by improperly weighing the medical evidence, her personal testimony, and the testimony of her friends and family members. Because this court agrees, the Commissioner's decision must be reversed.

### A.    Legal Standards

A person's RFC is the most he or she can still do despite his or her limitations. 20 CFR § 416.945(a)(1). It is that individual's "*maximum* remaining ability to do sustained work activities in an ordinary work setting, on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, *2; 20 CFR § 416.945 (b), (c). "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, *1. In assessing an individual's RFC, the Commissioner must consider all of a claimant's medically determinable impairments, whether severe or not, and all the relevant medical and other evidence in the record. 20 CFR § 416.945(a)(2)-(3). The RFC determination is based on "all of the relevant medical and other evidence," including any statements about what the claimant can still do provided by medical sources, whether based on a formal medical examination or not, and descriptions and observations of a claimant's limitation from his or her impairments provided by the claimant or his or her family, neighbors, and friends. 20 CFR § 416.945(a)(3); *see also*, SSR 96-8p, 1996 WL 374184, *5. The Commissioner has instructed the adjudicator to "consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." SSR 96-8p, 1996 WL 3714184, *5. The adjudicator must also give "careful consideration . . . to any available information about symptoms because subjective descriptions may indicate more severe limitations or restrictions that can be shown by objective medical evidence alone." *Id*.

**B.    Plaintiff's Evidence**

**1.    Medical Evidence**

In November 1999, plaintiff was examined by Dr. Sheri Skidmore, Ph.D. Tr. 384-91. This examination was scheduled as part of an earlier unsuccessful application for SSI benefits

that plaintiff did not appeal.  Tr. 227-30.  Plaintiff reported early, was appropriately groomed except for uncombed hair, and was accompanied by two adults and three children.  Tr. 384.  Dr. Skidmore reviewed her medical records including diagnoses by several doctors of anxiety and migraines.  *Id*.  At that time, plaintiff was working at least part-time at a truck stop.  Tr. 386.

Based on her clinical interview and mental status examination, Dr. Skidmore opined that plaintiff would be able to understand, remember, and carry out an extensive variety of uncomplicated and complex instructions.  Tr. 389.  Because she came across as very personable and interacted appropriately with Dr. Skidmore and her staff, plaintiff would be able to interact appropriately with supervisors, co-workers, and the public.  Tr. 390.  Even though plaintiff complained of having difficulty concentrating and staying on task, she was able to remain on task for the hour interview.  *Id*.  "Therefore, there is no indication at this time she would not be able to maintain concentration and attention sufficient to carry out simple, one or two step tasks."  *Id*.

Dr. Skidmore diagnosed plaintiff with Axis I:  panic disorder, NOS (self-reported, rule out); and mood disorder, NOS (self-reported, rule out); Axis II:  personality disorder, NOS with dependent and borderline features (rule out).  *Id*.  She assigned her a past and current GAF of 65.[2]  *Id*.  Dr. Skidmore concluded that plaintiff was "currently able to work" and that her recent lack of funds had "scared her into getting her own job."  *Id*.  Her prognosis was good.  *Id*.

---

[2]  The Global Assessment of Functioning ("GAF") is a tool for "reporting the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 2000) ("DSM-IV").  It is essentially a scale of zero to 100 in which the clinician considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," not including impairments in functioning due to physical or environmental limitations.  *Id*.  A GAF between 61 and 70 indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-VI, 32.

Dr. William J. Hoppe, M.D., examined plaintiff in September 2001 attendant to the care she was receiving from JCMH.  Tr. 500-03.  Plaintiff reported a history of panic attacks for many years which completely overwhelmed her in the past, but now she "rides them out."  Tr. 500. They usually lasted about 20 minutes and were characterized by severe anxiety, fearfulness, rapid heart rate, shortness of breath and a desire to escape.  *Id.*  She experienced an exacerbation of her symptoms, with panic attacks occurring almost daily in May 2001 after her daughter disclosed that her step-father (plaintiff's third husband) had raped her.  *Id.*  This caused more depression and frequent crying episodes, with increased anxiety in public.  *Id.*

On the mental status exam, Dr. Hoppe noted plaintiff was casually and appropriately dressed with normal motor activity, gait, and speech with normal spontaneity, rate and rhythm. Tr. 502.  She was cooperative and appropriate throughout the interview, and her affect was mildly anxious and mildly depressed.  *Id.*  Her thought process was direct and logical and appropriate in content with good insight and judgment.  *Id.*  She was alert and oriented, but her attention and concentration were not tested.  *Id.*

In spite of this unremarkable mental status exam, Dr. Hoppe diagnosed plaintiff with Axis I:  cyclothmia, rule out bipolar disorder, NOS with rapid cycling; panic disorder with agoraphobia; probable PTSD; and bulimia nervosa, and assigned her a GAF of 36.[3]  Tr. 502-03. He also discussed with her a possible diagnosis of attention deficit hyperactivity disorder

---

[3]  A GAF between 31 and 40 indicates "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM-IV, 32.

("ADHD") as possibly producing some of her symptoms.  Tr. 503.  Dr. Hoppe did not express

any direct opinion on plaintiff's functional capacity or ability to work.

Dr. G. William Salbador, M.D., conducted an "AFS/Vocational Rehabilitation Services

Evaluation" with plaintiff in March 2002.  Tr. 543-49.  He interviewed plaintiff for 90 minutes

after reviewing her available medical records, including the evaluation by Dr. Hoppe.  Tr. 543.

He recorded her chief complaint as not being "a very good patient" with a "borderline

personality disorder."  *Id*.

Plaintiff reported feeling depressed just about every day, frequently thinking about her

ex-husband and alternatively cringing at the thought of him or missing him.  *Id.*  She enjoyed

shopping twice a month, but occasionally lost control and bought more than she could afford.  *Id*.

She had low energy, difficulty falling asleep, and feelings of helplessness, hopelessness, and

worthlessness.  *Id*.  She had to push herself to be around people and had PTSD symptoms and

nightmares related to her own rape as a young girl by her uncle and abuse by her third husband.

*Id*.  Her mind was always racing with mood swings and occasional disassociation.  Tr. 544-45.

Her activities of daily living included getting up between 10:00 and 11:00 a.m, making a

simple breakfast for her and her baby, then doing little else all day.  Tr. 547.  Her children came

home in the afternoon, and by 5:00 to 6:00 p.m. she retired to her bedroom because she was

"usually sick of the chaos."  *Id*.  She handled her finances but grocery shopping was a

"conjoined effort" with her kids helping her.  *Id*.  She did not attend church or belong to any

clubs.  *Id*.  She was unable to focus on reading for very long, did some yard work, cleaned her

house, showered two to three times per week, and brushed her teeth four times a day.  Tr. 548.

Dr. Salbador diagnosed plaintiff with Axis I:  social phobia, generalized; dysthymia, chronic; history of a mood disorder with manic features due to tricyclic antidepressants; rule out primary bipolar affective disorder versus cyclothymia; rule out bulimia nervosa (per previous medical report); ADD, primary inattentive type (provisional); and Axis II:  borderline personality disorder with histrionic dependent and avoidant traits.  He assigned her a GAF of 50.[4]  Tr. 549.  Dr. Salbador noted that she had a "fairly good description of . . . chronic dysthymia that goes along with borderline personality" and "exhibits a fair amount of lability of her affect which is also seen."  Tr. 548.  Her chaotic personal relationship was consistent with borderline personality.  *Id*.  He noted a "component of seeming embellishment and describing things in an exaggerated and hyperbolic fashion . . . and a sense of needing to be the center of attention" which "would be consistent with a component of histrionic personality."  *Id.*  He remarked that "[o]ne of the most significant findings of my evaluation is what appears to be an incredible degree of anxiety when having to interact with others and being in social settings, something that apparently has been going on for quite a number of years and appears to have caused a significant degree of impairment in her work history in the past."  *Id*.  According to Dr. Salbador, "[i]t sounds like she has been chronically disabled due to her psychiatric difficulties for many years."  *Id*.

Dr. Salbador completed a Mental Residual Function Capacity Report in conjunction with his examination.  Tr. 550-53.  He opined that plaintiff was markedly limited in multiple areas, including the abilities to:  (1) maintain attention and concentration for extended periods;

---

[4]  A GAF score between 41 and 50 indicates "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (*e.g.*, no friends, unable to keep a job)."  DSM-IV, 32.

(2) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted by them; (5) complete a normal workday and workweek without interruption from psychologically based symptoms; (6) get along with co-workers and peers without distracting them or exhibiting behavioral extremes; (7) travel in unfamiliar places or use public transportation; and (8) set realistic goals or make plans independently of others. Tr. 551. On a Rating of Impairment Severity Report he indicated moderate restrictions of activities of daily living; marked restriction in social functioning; frequent interruption in concentration, persistence and pace; continual episodes of deterioration in work or work-like settings. Tr. 552-53. Her prognosis was "guarded." Tr. 553.

Dr. Richardson examined plaintiff over two days in January 2005 on referral from her primary care physician, William Palm, M.D., after she asked for a letter supporting her disability claim. Tr. 649-50. Dr. Palm referred her to a psychiatrist in his practice group, but plaintiff found the doctor's availability limited and specifically requested a referral to Dr. Richardson instead. Tr. 649. Dr. Richardson conducted a neuropsychological evaluation which included a review of plaintiff's medical records (including Drs. Salbador and Hoppe), a clinical interview, a mental status examination, and the administration of multiple tests. Tr. 218-23.

Plaintiff reported having problems with panic response in public, hating to be around strangers, and nervousness and depression since she was 15 years old. Tr. 218. She attempted suicide at age 15 and had a past history of molestation, parental abuse, and spousal abuse. *Id*. She had been on various medications, was hospitalized at age 15, and received several years of

counseling through a variety of mental health departments.  *Id*.  She was raised by her aunt for a time because her mom was "into her own self."  *Id*.

Dr. Richardson's mental status examination showed plaintiff was oriented to person, place, time, and situation.  Tr. 220.  Her eye contact was good and affect was full without impairment.  *Id*.  She came on time accompanied by her sister, had properly combed hair, was congenial and cooperative, and appeared to give her best efforts to the evaluation.  *Id*.  She indicated nightmares on a weekly basis and flashbacks, both related to her abuse.  *Id*. Dr. Richardson noted ideas of reference related to anxiety and similar patterns of perceptual distortion.  *Id*.  Plaintiff indicated that she did not feel safe in her own home and has a hard time relaxing.  *Id*.

Dr. Richardson administered a number of tests.  The Wide Range Achievement Test - III showed reading and spelling ability at the post-high school level, but math skills only at an 8th grade level.  *Id*.  The Wechsler Adult Intelligence Scale-III showed her Full Scale IQ was in the 39th percentile, or high-average; verbal comprehension was in the 75th percentile and her perceptual organization was in the 97th percentile.  *Id*.  It was "obvious that she is functioning in the high-average to superior range in the performance and visual spatial tasks."  *Id*.

The Richardson Diagnostic Questionnaire-Revised indicated a litany of issues, including possible bipolar condition including depressive phases with pervasive sadness, sleep disturbance, depression, and dysphoria.  Tr. 221.  The Yale Brown Obsessive Compulsive scale showed multiple obsessions and compulsions that were of a relatively severe nature.  *Id*.  The Amen Clinic ADD Subtype Questionnaire was completed by the plaintiff, her boyfriend, son, and sister.  *Id*.  All questionnaires indicated the presence of a combined Attention-Deficit

Hyperactive Disorder ("ADHD") with definite indications of temporal lobe dysfunction, as well as bipolar and obsessive-compulsive tendencies.  *Id*.  The Detailed Assessment of Posttraumatic Stress showed indications of posttraumatic stress symptomatology with dissociative components with further indications of a high level of suicide risk.  Tr. 222.  The Million Clinical Multiaxial Inventory-III showed definite indications of posttraumatic stress and a severe anxiety disorder, severe depression and bipolarity.  *Id*.  It also showed borderline personality traits, dependent, depressive, and self-defeating patterns.  *Id*.  Plaintiff's responses to the Minnesota Multiphasic Personality Inventory-2 produced an invalid profile due to test results which indicated over-reporting of symptoms.  *Id*.  Dr. Richardson noted that "[t]aking it on face value and assuming that it is valid with representation of severe distress, the results would be consistent with the indicators previously noted."  *Id*.

Dr. Richardson diagnosed plaintiff with Axis I:  bipolar disorder, NOS; obsessive-compulsive disorder; PTSD; panic disorder with mild Agoraphobia; dyssomnia, NOS; and Axis II:  borderline personality with multiple features including self-defeating elements.  Tr. 223.  He also noted the possibility of an eating disorder and recommended further assessment.  *Id*.  He opined that her bipolar condition was severe enough to cause substantial difficulty in being stabilized.  Tr. 222.  Her posttraumatic stress issues were extremely high and would create dissociative elements that could undermine the ability for her to focus and follow through with different tasks.  *Id*.  Although Dr. Richardson did not complete an RFC report, it is apparent that he found the effects of plaintiff's mental conditions severely limiting.  His opinion concerning plaintiff's inability to focus and follow through on a task is consistent with Dr. Salbador's findings in this area.

Finally, Dr. Michael R. Villanueva, Psy.D., examined plaintiff in May 2006, in response to the Appeals Council's requirement in its Remand Order that the ALJ obtain "a consultative mental status examination with psychological testing." Tr. 106. Dr. Villanueva noted that "[s]pecific points to be covered in this examination include: anxiety; panic attacks; depression; [and] mania." Tr. 170. Plaintiff came unaccompanied to the evaluation. She complained primarily of anxiety and said she became nervous and sick to her stomach when she gong out in public. *Id*. In general, plaintiff's complaints and report of her personal and medical history match, to a substantial degree, the information she gave to prior examiners. Dr. Villanueva conducted a clinical interview, reviewed her extensive medical records (including the reports of Drs. Skidmore, Hoppe, Salbador, and Richardson), performed a mental status exam, and conducted a number of psychological tests. Tr. 173-75. Plaintiff completed her mental status examination with a score of 30 of 30 indicating that she was alert, oriented, and able to follow simple commands. Tr. 176. Psychological testing showed her intellect fell within the average to above-average range. *Id*. Her verbal abilities, working memory, and processing speed were all within normal limits. *Id*. Using the Trail Making test, Dr. Villanueva concluded that plaintiff's ability to integrate visual and motor activity on a sustained attention task, as well as her verbal and visual memory, were within normal limits. *Id*.

Dr. Villanueva's impression was that plaintiff had Axis I: a possible anxiety disorder and possible history of hypomanic episodes, and Axis II: a likely personality disorder with borderline features. *Id*. He found her to be doing well cognitively and able to follow instructions, but she reported a great deal of restriction in her daily activities. *Id*.

Dr. Villanueva completed a Medical Source Statement of Ability to do Work-Related Activities (Mental) form.  Tr. 180-82.  He found only moderate limitations in plaintiff's ability to interact appropriately with the public, supervisors and co-workers and in her ability to respond appropriately to work pressures in a usual work setting or to changes in a work routine.  Tr. 181. He found no limitations in her ability to understand, remember, and carry out simple or complex instructions.  Tr. 180.

Dr. William Hennings, M.D., a reviewing physician for the Department of Disability Services ("DDS"), also evaluated plaintiff's functional capacity, but only by reviewing her medical records.  He completed two forms, one which addressed whether plaintiff met any of the listed mental impairments (Tr. 565-78) and another which evaluated her RFC.  Tr. 561-64.  He concluded that plaintiff had several severe medically determinable impairments which did not precisely satisfy the diagnostic criteria of the listings for ADHD, dysthymia, social phobia, and borderline personality disorder.  Tr. 565.

With respect to her RFC, he concluded that plaintiff was only moderately limited in her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them; and in her ability to interact appropriately with the general public.  Tr. 561-62.  Otherwise, plaintiff was not significantly limited.  *Id.*

In reaching his findings, Dr. Hennings considered and disagreed with the findings of Drs. Salbador and Hoppe.  Dr. Hennings found an inconsistency between Dr. Salbador's conclusion that plaintiff has marked limitations in multiple areas of functioning and the GAF of 50 assigned to her.  Tr. 577.  He noted a similar inconsistency between Dr. Hoppe's GAF of 36

and his normal findings on the status examination.  *Id*.  He also considered that despite saying

she did not like to go outside and only wanted to sleep, plaintiff cared for a dog and three

children, cooked, swept, vacuumed, mopped, did laundry, paid the bills, and shopped with her

children.  *Id*.  According to Dr. Hennings, this level of activity is not consistent with the

limitations given by Dr. Salbador or her performance on his psychiatric evaluation where her

attention and concentration were adequate.  *Id*.  As a result, Dr. Hennings opined that despite her

moderate limitations, plaintiff would be able to "complete a normal work week with reasonably

supportive supervision as long as she does not have to interact closely with co-workers," and as

long as she "did not have to deal with the public."  Tr. 563.

Finally, Robert McDevitt, M.D., testified by telephone at the second hearing as a medical

expert based on his review of plaintiff's medical records.  Tr. 704.  He testified that plaintiff had

no problems in the area of concentration, persistence, and pace, but did have some level of

difficulty in maintaining social functioning and some restriction in her activities of daily living.

Tr. 706.  He found insufficient evidence for a diagnosis of affective disorder or bipolar disorder,

but concluded that plaintiff had a "fairly well established personality disorder diagnosis" and

might have a diagnosis "at 12.06 of anxiety disorder with some agoraphobic features . . ."

Tr. 706-07; *see* 20 CFR Pt. 404, Subpt P, App. 1, § 12.06.

Dr. McDevitt did not believe that plaintiff had any difficulties in maintaining

concentration, persistence, and pace, and found no major impairment in her activities of daily

living.  Tr. 708.  Her only area of true impairment was in her ability to maintain social

functioning.  *Id*.  In concluding that plaintiff could work outside the home, Dr. McDevitt relied

on the fact that she was attending chiropractic care two or three days a week for a period of

several months.  Tr. 711, 164-69.  He also noted a record in which she purportedly told a

chiropractor that she could work the entire day.  Tr. 711.  It has since come to light that this latter

record was not plaintiff's and was improperly included in her file; the Commissioner has since

excised it from her record.  It is difficult to say what impact this error would have on

Dr. McDevitt's conclusions.

Dr. McDevitt approved of the ALJ's proposed RFC, including a limitation of no

interaction with the general public and no close interaction with coworkers, avoiding jobs with

interstate driving or crowded work settings, and no jobs with frequent changes in work routines.

Tr. 709-10.

On cross-examination by plaintiff's attorney, Dr. McDevitt quarreled with Dr. Salbador's

findings concerning plaintiff's RFC as not being supported by the record.  Tr. 714.  In his

opinion, Dr. Salbador's conclusion that plaintiff had marked limitations in multiple areas was

based on his perception as of "that moment in time taking into account that some of his clinical

judgment [was] based upon the history given to him by the patient without direct observation of

whether [it] [was] true or not."  Tr. 715.  Dr. McDevitt also noted the Dr. Salbador's finding of

marked limitations in concentration differed from his observations during the mental status exam

when plaintiff did not exhibit difficulty with attention and concentration.  Tr. 715.  Dr. McDevitt

seemed to agree that Dr. Salbador's finding that plaintiff would have difficulty with co-workers

and supervisors was consistent with his observations during the his mental status exam.  Tr. 717-

18.  He disagreed with the diagnosis of bipolar disorder.  Tr. 705.

When asked whether plaintiff had "the ability to maintain a regular competitive work

schedule and maintain attendance day in, day out without missing any days and being

consistent," Dr. McDevitt responded that "it would be flying in the face of her long history that [she] would be able to do that." Tr. 719-20. He later qualified this statement by hedging, stating that he did not "really have anything in the record that would help [him] make judgment one way or the other on that." Tr. 720. Dr. McDevitt also testified that due to her personality disorder, plaintiff would have difficulty with supervisors, "although the correct supervisor could probably get her to work quite well." Tr. 722. Finally, he opined that "in a familiar, comfortable setting she could work" but "if she's never had very much training outside the home . . . she would probably need some kind of rehabilitation education . . . ." Tr. 723.

In addition to these medical opinions, the record documents that plaintiff has received years of treatment from multiple treating physicians and mental health professionals. She consistently complains that she suffers from panic disorder and experiences severe panic attacks and depression, in addition to numerous other mental health issues. *See* Tr. 141-42, 441, 427-28, 489, 498, 515-16, 541-42, 553, 611-13.

### 2.    Plaintiff's Testimony

Plaintiff's subjective complaints about the symptoms caused by her mental illness has been consistent throughout the years. In 1999 she complained to her counselor at RCMH that she had panic and anxiety attacks that caused heart palpitations, hyperventilation, cold and clammy hands, and which made her feel like she was going to die. Tr. 441. She also complained of depression and sleep disturbances. Tr. 420, 425. She was treated for the same conditions and symptoms at JCMH. Tr. 511-16. Initially at JCMH it was determined that her "constellation of symptoms, prolonged psychiatric history, current insecure situation and personality disorder" would make group therapy inappropriate and that she would require

individualized counseling to establish emotional stability.  Tr. 510.  She reported similar symptoms to Dr. Hoppe in September 2001, indicating that her panic attacks completely overwhelmed her and caused severe anxiety, fearfulness, rapid heart rate, shortness of breath, and a desire to escape.  Tr. 500.  She reported nearly identical symptoms to Eric S. Webb, M.D., in October 2001 (Tr. 541-42), Dr. Salbador in 2002 (Tr. 543-49), Dr. Palm in 2003 and 2004 (Tr. 590, 587), and Patrick Yeakey, M.D., in 2004 and 2005 (Tr. 639, 156).

At her first hearing on December 15, 2004, plaintiff testified that "it's been really hard for me to keep working because it seems like I get sick a lot.  I get depressed a lot.  I have a hard time when I have to leave my house a lot.  I get really nervous, I get really panicky."  Tr. 666.  Her panic attacks limited where she can go and caused her to shut herself up in her house.  Tr. 667.  She cried a lot and needed help doing chores and cooking for herself and her children.  Tr. 668.  Her children went to the store with her.  Tr. 669.  She did not believe she was strong enough to go out into the world and work a job, even if it was low stress.  *Id*.

At her second hearing on November 7, 2006, plaintiff added little to her earlier testimony.  She said that she did not sleep well, cried a lot, and did not like to leave her house.  Tr. 699.  Her 22-year-old daughter now lived with her and helped her with cooking and cleaning.  Tr. 695.  She sent one of her children to live with a neighbor for a while because she was so depressed.  Tr. 696.  She wore the same clothes for several days at a time and washed her hair every three or four days.  Tr. 699.  Her daughter did her shopping when she did not want to leave her house.  *Id*.          **3.    Lay Testimony**

At the first hearing, plaintiff's daughter testified that she saw her mother on a daily basis and helped her pay rent, shop, watch her siblings, and do other household duties.  Tr. 675.  Her

mother sometimes spent time in the bathroom crying or sick in bed with a migraine, leaving the

children to care for themselves.  Tr. 676.  In public, her mother got clammy and pale and looked

like she would of vomit because she was so wound up and nervous.  Tr. 676-77.  Her mother

started projects and quit them before finishing.  Tr. 678.  She sometimes walked out of stores

before finishing the shopping due to panic attacks, and had witnessed one of these attacks a few

days before the hearing.  Tr. 678-79.

 The testimony of plaintiff and her daughter is substantially in accord with third party

reports given on her behalf in her earlier, unsuccessful disability application.  Tr. 280-88.  These

include statements that plaintiff does housework but not by herself; has difficulty sleeping;

cooks, shops, and does laundry, but not frequently; cannot focus on tasks for long periods of

time; and has panic attacks in which she feels like she is having a heart attack, cannot breath, and

says she feels like she is going to die.

### C. ALJ's Findings

 As discussed above, the ALJ concluded that plaintiff has the RFC to perform work

without exertional limitations in which she does not interact with the general public; has no close

interaction with co-workers; does no interstate driving; is not in a crowded work settings; and

has no frequent changes in work routines or locations.  In reaching this conclusion, the ALJ

relied heavily on the opinions of Drs. McDevitt and Villanueva and discounted the findings of

Drs. Hoppe, Salbador and Richardson.  She also concluded that plaintiff was unreliable because

she "is shown to exaggerate her symptomatology and to take actions unduly directed at obtaining

disability benefits."  Tr. 21.  This lack of credibility infected the opinions of those doctors who

found plaintiff to be "severely impaired" because their opinions were "marked by an undue

reliance on an individual who is not reliable regarding her symptoms." Tr. 29.  She also deemed

these opinions inconsistent with the other relevant evidence in the record.  *Id*.  The ALJ

concluded that due to plaintiff's lack of credibility, "third party statements suggesting that she is

'disabled,' . . . must also be discounted" because her "self-dramatizations, observations of others

are prone to reflecting the inaccurate picture she chooses to present."  Tr. 33.

>    **D.**    **Analysis**

This court concludes that the ALJ's excessively jaundiced view of plaintiff caused her to

incorrectly reject the legitimate information in the record indicating she is disabled.  When

properly credited, this evidence compels a finding that plaintiff is disabled.

>    **1.**    **Medical Evidence**

With respect to the medical evidence, the ALJ is responsible for resolving conflicts and

ambiguities.  *See Batson*, 359 F3d at 1195.  However, when the record contains contradictory

medical opinions, the ALJ must provide specific and legitimate reasons for rejecting an

examining doctor's opinion that is supported by substantial evidence in the record.  *Lester v.

Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted).  Furthermore, the opinion of an

examining physician is entitled to greater weight than the opinion of a non-examining physician.

*Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).

Here, the record contains multiple examining physician opinions which vary widely in

their opinions of plaintiff's RFC.  With respect to Dr. Hoppe, the ALJ concluded that his GAF of

36 conflicted with his unremarkable mental status examination and that he indicated plaintiff

was far more impaired than any other examining physician opined.  Tr. 32.

The ALJ dismissed Dr. Richardson's opinions as "entitled to little weight" for taking plaintiff's complaints at face value "even when they [were] inconsistent with the rest of the record" and for ignoring her histrionic traits.  Tr. 33.  She further found his conclusion that the elevated F-Scale could actually be a sign of significant underlying distress to be "implausible" because "numerous examining and treating sources have reported histrionic personality traits and overly dramatic presentations."  Tr. 29.  She also found that he was improperly acting as an advocate since plaintiff specifically requested a referral to him from Dr. Palm although his office was over 100 miles away, which indicated a strong element of "doctor shopping."  Tr. 33.  The fact that some of his conclusions were premised on questionnaires of third parties did not add anything to his opinion because "they would only reflect the behavior of an individual who is established as being dramatic and exaggerating in her actions and statements."  *Id*.

Similarly, the ALJ rejected Dr. Salbador's more severe findings regarding plaintiff's limitations as being inconsistent with his fairly unremarkable mental status exam and as relying too much on the plaintiff's subjective complaints.  Tr. 32.

The ALJ's assessment of the medical evidence is in error.

### a.    Reliance on Plaintiff's Subjective Complaints

The fact that a physician has relied on a the subjective complaints of a properly discredited plaintiff can, in some circumstances, be a legitimate basis for disregarding that physician's opinions.  *See Morgan v. Apfel*, 169 F3d 595, 602 (9th Cir 1999), quoting *Fair v. Bowen*, 885 F2d 597, 605 (9th Cir 1989).  "But an ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his

ultimate opinion with his own observations."   *Ryan v. Comm'r*, 528 F3d 1194, 1199-1200 (9th

Cir 2008), citing *Edlund*, 253 F3d at 1159.

All three doctors dismissed by the ALJ relied to some degree on plaintiff's subjective

report of her symptoms.   Nevertheless, none of them questioned her self-report, and each issued

his opinion based, in part, upon his own observations.   Moreover, far from being deceived by her

exaggeration, both Dr. Richardson and Dr. Salbador recognized that plaintiff overreported and

exaggerated, yet both believed her hyperbolic and histrionic tendencies to be a function of her

mental illness, not evidence of malingering.   Because they actually observed plaintiff, their

characterization of her behavior carries more weight than the *post hoc* gloss placed on their

findings by the ALJ or reviewing physicians employed by the Commissioner.   The ALJ appears

to believe that a person who has a personality disorder with histrionic traits is entirely

unbelievable and that any doctor who bases a medical opinion on self-reports by such a patient is

fatally flawed.   This cannot be the case where these professionals found plaintiff's histrionic

tendencies, including exaggeration and hyperbole, not to be evidence of malingering, but rather,

indicators of mental illness.   The ALJ's second-guessing of their medical judgment on this issue

is not a legitimate reason for rejecting their opinions.

The ALJ used some of Dr. Salbador's comments taken out of context to support her

opinion that plaintiff is not credible.   Dr. Salbador, as Dr. Richardson, found that her tendency to

embellish and exaggerate, along with her need to be the center of attention, would be a

component of a histrionic personality disorder and would be consistent with previous psychiatric

and psychological reports describing the possibility of a cyclic mood disorder such as

cyclothymia or bipolar disorder.   Tr. 548.   The ALJ focused on the finding that plaintiff

exaggerates without accepting the diagnosis that exaggeration is a manifestation of her mental illness. This selective reading of his opinion improperly substitutes the ALJ's opinion for Dr. Salbador's professional judgment.

As the ALJ correctly notes, Dr. Salbador's mental status exam was unremarkable except for plaintiff exhibiting a very wide ranging and labile mood and affect. However, based on plaintiff's clinical interview and mental status examination, Dr. Salbador commented that "[o]ne of the most significant findings of my evaluation is what appears to be an incredible degree of anxiety when having to interact with others and being in social settings." Tr. 548. He noted that this "apparently has been going on for quite a number of years and appears to have caused a significant degree of impairment in her work history in the past." *Id*. These comments are not only supported by plaintiff's subjective report of her medical and psychological history, but are consistent with the nearly ten year treatment history for just such an anxiety disorder and by its impacts on plaintiff's daily life as noted by medical professionals, friends, and her family.

Dr. Richardson based his conclusions not only, or evenly primarily, on plaintiff's self-reports (as the ALJ erroneously found), but on numerous psychological tests. The results of these tests indicated that plaintiff indeed suffered from the very impairments she claimed, including bipolar disorder, ADHD, PTSD, and severe anxiety and depression. Using the ALJ's own words, the results of his testing suggested plaintiff was suffering from "acute impairment." Tr. 33. Furthermore, Dr. Richardson's opinion, including plaintiff's elevated F-Scale scores on the MMPI-2 as a function of her underlying distress, is consistent with the opinion of Dr. Salbador.

This leaves Dr. Hoppe.  His opinion reflects the lowest GAF score and also relies upon plaintiff's self-reporting.  An important factor missing from the ALJ's analysis is that, unlike the other four examining physicians, Dr. Hoppe's examination was not given as part of plaintiff's efforts to obtain social security benefits, but was part of a treatment plan at JCMH to address her many mental health issues.  Dr. Hoppe would have been privy to the agency's records and made reference to her intake examination given three months prior to his examination.  He did not question plaintiff's credibility, but affirmed that she had serious mental health issues which would require individualized treatment with JCMH.  The ALJ erred by rejecting his conclusions.

All three of these medical professionals made their own observations about plaintiff's condition and issued opinions based upon them.  The fact that they relied, in part, on plaintiff's self-report is not a legitimate basis, in this case, for rejecting their opinions.

**b.    Consistency With Other Evidence in the Record**

Another factor that an ALJ may consider in weighing medical evidence its consistency with the other substantial evidence in the record.  20 CFR § 416.927(d)(4).  The examining physicians agree in their diagnoses to a certain extent.  They all found that plaintiff suffered at a minimum from panic disorder, mood disorder or depression, and a borderline personality disorder or personality disorder.  In addition, Drs. Hoppe, Salbador, and Richardson all found plaintiff suffered from cyclothmic or bipolar disorder and PTSD.

Dr. Richardson's opinion was by far the most extreme diagnosis, and the ALJ focused her attack primarily at his conclusions.  She criticized his diagnoses as not shared by other examining physicians.  This criticism is misplaced given that no other physician administered as thorough an examination or the same psychological tests.  If the record revealed another

examining physician who applied the same or similar tests and yet reached different results, the ALJ's point would be well-taken.  No such exam exists.  The only opinion in the record that directly contradicts Dr. Richardson is that given by Dr. McDevitt who did not examine plaintiff or administer the tests on which Dr. Richardson relied.  As such, many of Dr. Richardson's conclusions are essentially uncontradicted by any substantial evidence and should have been credited.

The ALJ's criticism of Richardson on this issue is particularly troubling considering the Appeals Council's instruction to the ALJ to acquire additional psychological testing.  Instead of obtaining an examination to match the depth of Dr. Richardson's, the ALJ accepted Dr. Villanueva's 60-minute examination which did include some psychological testing, but was aimed only at measuring plaintiff's intellectual functioning, memory, and ability to apply sustained attention to a task.  Plaintiff's intellectual capacity and memory are not in dispute since the primary issue is whether, given her acknowledged panic, mood, and personality disorders, she has the ability to perform a job eight hours a day, five days a week.  No tests were directed at determining the existence or severity of the various psychological disorders diagnosed by Dr. Richardson.

The ALJ also found that plaintiff's ability to attend numerous medical appointments without distress was inconsistent with the more severe findings of Drs. Hoppe, Salbador, and Richardson.  This is not a persuasive reason for rejecting the conclusions of these examining physicians.  Whether plaintiff can attend medical appointments has little bearing on whether she is able to maintain an eight-to-five workday, five days a week.  Even the Commissioner's own medical expert, Dr. McDevitt, admitted that this ability would be inconsistent with plaintiff's

history.  Furthermore, this court suspects that had plaintiff failed to attend her various appointments, the ALJ would have criticized her for failing to comply with treatment as evidence of malingering.  Her tenacity in seeking out treatment, in spite of her severe limitations, bolsters her credibility and does not contradict her physicians' serious diagnoses.

Moreover, the ALJ improperly considered only those instances where plaintiff appeared in no apparent distress.  The ALJ did not consider the many other instances when plaintiff complained of severe anxiety and depression.  *See*, *e.g.*, 141-42, 427, 445, 492, 498-99, 510, 611-13 (ER report of stomach pain secondary to stress).  More persuasive is the fact that at no time did her treating physicians or mental health counselors challenge her credibility or express the suspicion that she may be malingering.  Instead, they consistently counseled her and prescribed medication to help her cope.  The fact that plaintiff may have presented on a given day in a good mood or with a normal affect does not discount the opinions of the medical professionals who diagnosed her based upon their own independent examination.

In summary, the ALJ's reasons for rejecting the opinions of Dr. Hopee, Salbador, and Richardson are not supported by the evidence in the record.  Credited as true, their opinions support plaintiff's claim that she is unable to work.

///

///

///

### 2. **Plaintiff's Credibility**

#### a. **Legal Standard**

Once a claimant shows an underlying impairment which may reasonably be expected to produce the pain or other symptoms, and absent any evidence of malingering, the ALJ must provide "clear and convincing" reasons to discredit the claimant's testimony regarding the severity of symptoms. *Lingenfelter,* 504 F3d at 1036 (citations omitted). The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995), citing *Bunnell v. Sullivan*, 947 F2d 341, 345-46 (9th Cir 1991) (*en banc*). The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen v. Chater*, 80 F3d 1273, 1284 (9th Cir 1996). The ALJ may also employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms. *Id*; *see also* SSR 96-7p, 1996 WL 374186 (July 2, 1996). Once a claimant shows an underlying impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F3d at 883 (citation omitted).

The ALJ gave several reasons for doubting plaintiff's credibility. Because she made no finding of malingering, these reasons must be clear and convincing.

///

### b.    <u>Tendency to Exaggerate</u>

The ALJ found that "the claimant is shown to exaggerate her symptomatology, and to take actions unduly directed at obtaining disability benefits." Tr. 33. As to the latter, the only

evidence provided by the ALJ is plaintiff's effort to obtain an exam by Dr. Richardson.  As

discussed above, Dr. Richardson performed an extensive exam and applied objective psychiatric

testing to reach his conclusions.  Since plaintiff must prove that she is disabled, she is as free as

the Commissioner to obtain an evaluation from a doctor of her choice.  Because

Dr. Richardson's exam is more thorough and based on more objective data than any other

opinion in the record, plaintiff cannot be faulted for seeking his opinion.  His opinion must rise

and fall on its own merits, not because the ALJ suspects plaintiff's motives in obtaining it.  If the

ALJ had serious doubts about the quality of his examination, then she could have required

plaintiff to undergo a neuropsychological examination of similar quality for comparison.  She

did not.

      With respect to the plaintiff's "histrionic" tendencies, the Commissioner cites

*Tonapetyan v. Halter*, 242 F3d 1144, 1148 (9th Cir 2001), for the proposition that a "tendency to

exaggerate" is a clear and convincing reason for rejecting a claimant's subjective statements.

Several of plaintiff's physicians did note her tendency to exaggerate or speak in hyperbole.

Nevertheless, this case is distinguishable from *Tonapetyan*.  In *Tonapetyan*, the physician noted

that the plaintiff attempted to skew results by giving "poor effort" during cognitive testing, but

then was much more cooperative when describing why he was unable to work, yet was not

cooperative while testifying at the hearing.  Unlike *Tonapetyan*, plaintiff was cooperative during

all of her examinations and the administrative process with no effort at deception.  All examiners

noted that she was cooperative during testing, and she gave them no reason to doubt her efforts

or her story.  In addition, her examining physicians found that her histrionics were a part of her

medical condition.  Finally, as discussed below, plaintiff's accounts of her symptoms and

activities of daily living are confirmed by the observations of those closest to her, which shows that her tendency to exaggerate does not mean that she is misrepresenting her functional abilities.

### c.       Activities of Daily Living

The ALJ found that plaintiff's ability to attend numerous appointments with her doctor, chiropractor, and therapist, and to cook, clean, and care for her children demonstrates that she is capable of functioning in the work environment. Tr. 31. Inconsistencies between a claimant's reported symptoms and her activities of daily living are a valid basis for rejecting a claimant's complaints. *See Fair*, 885 F2d at 603 (noting that "if, despite his claims of pain, a claimant is able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that the claimant's pain does not prevent the claimant from working."). This type of evidence is proper, however, only where it sheds light on the claimant's actual abilities and demonstrates that she has skills or abilities which could be transferred to a work setting. *See Burch v. Barnhart*, 400 F3d 676, 681 (9th Cir 2005) ("As this Court previously has explained, if a claimant engages in numerous daily activities involving skills that could be transferred to the workplace, the ALJ may discredit the claimant's allegations upon making specific findings relating to those activities."); *Morgan,* 169 F3d at 600 (finding that the claimant's ability to fix meals, do laundry, work in the yard, and occasionally care for his friend's child was evidence of claimant's ability to work). But it is equally true that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits and many home activities are not easily transferable to what may be the more grueling environment of the workplace, where it might be

impossible to periodically rest or take medication." *Fair*, 885 F2d at 603 (internal citations omitted).

The ALJ views plaintiff as an ordinary and normal functioning adult who carries out her domestic duties without difficulty. That view is not supported by the record. According to plaintiff, her daughter, and others that know her, her ability to function is much more restricted. She does chores, but with such infrequency that her "house is usually in disarray." Tr. 284. She goes to the store once a week, but normally with someone to provide support, and her symptoms sometimes force her to leave before she has completed her shopping. Tr. 305, 678-79. Her older children help prepare meals and, at the time of her second hearing, her eldest daughter had moved back into her home to help her and had even enlisted a neighbor's help in raising one of her children. Tr. 695-700. She showers and changes her clothes infrequently. Tr. 699. Her tendency to lock herself in the bathroom or her room does not portray a highly functioning adult capable of the rigors of full-time work. Tr. 676.

Finally, as mentioned above, the fact that plaintiff is able to attend scheduled medical appointments is not a clear and convincing reason for finding her not disabled, given her repeated diagnoses of anxiety disorder with agoraphobia by the very physicians she was repeatedly seeing. Rather, her attempts to obtain treatment for her illness bolsters her credibility that she is attempting to deal with her psychological difficulties. It is apparent from the record that plaintiff's only trips outside her home were to doctors and therapists and, occasionally, to the store. This does not reflect a level of activity readily transferable into the ability to work eight hours a day, five days a week. The ALJ's own medical expert recognized that to be able to

make that transition, plaintiff would likely need some type of vocational rehabilitation or "a familiar, comfortable setting" with "the right kind of program." Tr. 723.

Thus, plaintiff's activities of daily living do not provide a clear and convincing basis for doubting her credibility.

**d.**    **Inconsistencies in record and medical evidence**

The ALJ also found suspicious the fact that authorities chose not to act on plaintiff's and her daughter's claims of abuse, and the ALJ found it hard to believe that plaintiff would miss the very husband she claimed to be her abuser. Tr. 29. Plaintiff addressed many of these issues in her follow-up letter to the ALJ's first opinion and, after being questioned on this issue by the ALJ at her first hearing, her daughter provided a very plausible explanation for why no charges were brought for her alleged rape. Tr. 57-58. It suffices to say that the ALJ was not privy to why law enforcement or the prosecutor decided not to pursue charges against plaintiff's third husband. The ALJ also is not an expert in the psychology of abuse victims, casting doubt on her incredulity at plaintiff's conflicted feelings about her husband. Finally, to the extent that the ALJ relied upon second-hand accounts of the family-related legal issues in plaintiff's past, such as custody issues over the plaintiff's children, the information bears little weight. The ALJ drew inferences from second-hand accounts recorded by plaintiff's therapists as to what happened.

Finally, this court is not persuaded by comments that plaintiff was in "no acute distress" or maintained good eye conduct during an exam. This is not a clear and convincing reason for doubting her subjective statements since these same physicians did not conclude that these observations conflicted with their diagnoses.

Thus, plaintiff's subjective complaints are not contradicted by the evidence in the record.

3.    **Lay Testimony**

Plaintiff's credibility is supported by the reports of the lay witnesses.  "Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." *Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001); 20 CFR § 416.913(d)(4).  As discussed above, plaintiff's daughter provided an account of her mother's serious symptoms and inability to care for herself or her children without help.  Rather than providing a pertinent reason for disregarding this testimony, the ALJ lumped all third-party statements together as suspect because "in view of her demonstrated self-dramatizations, observations of others are prone to reflecting the inaccurate picture she chooses to present."  Tr. 33.  In making such a broad generalization, the ALJ gives short shrift to the observations of plaintiff's daughter without providing any reason for disbelieving her specifically.

In any event, the record shows that plaintiff's daughter helps her with raising her children and performing other basic activities.  Furthermore, there is no basis in the record for disbelieving her daughter's account that plaintiff frequently locks herself in her room and bathroom.  Plaintiff testified that by the time of her second hearing, her adult daughter had moved back in to assist her.

Plaintiff's and her daughter's accounts are supported by third-party reports submitted in 1999 by a friend, her mother, and her third husband.  Tr. 280-88.  Her friend reported she "must go shopping with a companion" and "can't sit through an entire movie" or "drive on the highway."  Tr. 280.  Her mother stated that although plaintiff could cook meals and do laundry and dishes, she "cannot focus on certain tasks for a long period of time and seems to be really

hyperactive at times." Tr. 281-82. Plaintiff "does not like to go anywhere alone," she does

cook, but does not bathe every day, and the "house is usually in disarray." Tr. 284. She states

that plaintiff had panic attacks when leaving the house. Plaintiff's husband also reported she had

panic attacks, cooked infrequently, did not sleep well, and that he had to take her to the hospital

due to her panic attacks making her feel like she was going to die. Tr. 286-88. Although these

reports were made many years ago and in support of a separate, unsuccessful application, they

generally agree with plaintiff's recent testimony and that of her daughter. The ALJ was remiss

in dismissing them without providing a legitimate, germane basis. Because their testimony

accords with the substantial evidence in the record, it should have been credited.

## IV.    Remand

After finding that the ALJ erred, this court has discretion to remand for further

proceedings or for immediate payment of benefits. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th

Cir 2000). The issue turns on the utility of further proceedings. A remand for an award of

benefits is appropriate when no useful purpose would be served by further administrative

proceedings or when the record has been fully developed and the evidence is not sufficient to

support the Commissioner's decision. *Rodriguez v. Bowen*, 876 F2d 759, 763 (9th Cir 1989).

Thus, improperly rejected evidence should be credited as true and an immediate award of

benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting

such evidence, (2) there are no outstanding issues that must be resolved before a determination

of disability can be made, and (3) it is clear from the record that the ALJ would be required to

find the claimant disabled were such evidence credited." *Harman*, 211 F3d at 1178, citing

*Smolen*, 80 F3d at 1292. Where it is not clear the ALJ would be required to award benefits were

the improperly rejected evidence credited, the court has discretion whether to credit the evidence. *Connett v. Barnhart,* 340 F3d 871, 876 (9th Cir 2003).

This case clearly must be remanded for immediate payment of benefits.  As stated by Dr. McDevitt, plaintiff's ability to maintain a normal workweek flies in the face of her extensive history of mental illness.  Several examining physicians have shown her to be profoundly affected by various mental disorders that cause her to have anxiety attacks and freeze-up in public.  This has not been a short-lived problem as the record shows she has been having these attacks for over a decade.  At the second hearing, the VE agreed that if plaintiff were limited to working in a sheltered workshop, as Dr. McDevitt suggested, or had to miss more than one day a month, she would not be able to perform any of the jobs he identified.  In view of plaintiff's mental illness, this court finds that these may be charitable assumptions about her ability to carry out job in a competitive work environment.  Accordingly, this case is remanded for an award of benefits.

///

///

## **ORDERS**

Plaintiff's Motion to Expand the Record (docket #16) is GRANTED as to Exhibits A and C and DENIED as to Exhibit B.

The Commissioner's decision is REVERSED and this case is REMANDED pursuant to Sentence Four of 42 USC § 405(g) for the calculation and award of benefits.

DATED this 23rd day of January, 2009.

s/  Janice M. Stewart_____

Janice M. Stewart
United States Magistrate Judge